# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HISTORICAL SOCIETY OF WESTERN PENNSYLVANIA, | Case No: 20-1286 |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| FEDERAL INSURANCE COMPANY, | |
| Defendant. | |

## PLAINTIFF'S COMPLAINT

Plaintiff Historical Society of Western Pennsylvania ("Plaintiff" or "HSWP") brings this Complaint alleging relief against Defendant Federal Insurance Company ("Defendant" or "Federal Insurance") and avers as follows:

## NATURE OF THE CASE

1. This is a complaint seeking declaratory relief arising from Plaintiff's contract of insurance with Defendant.

2. In light of the global coronavirus disease 2019 ("COVID-19") pandemic and state and local government orders ("Civil Authority Orders") mandating that all non-essential in-store businesses must shut down, Plaintiff has suffered business loss.

3. Plaintiff's insurance policy ("Policy") provides coverage for all non-excluded business losses and thus provide coverage here.

4. As a result, Plaintiff is entitled to declaratory relief that it is covered for all business losses that have been incurred in an amount greater than $150,000.

1

## JURISDICTION

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between Plaintiff and Defendant. Further, Plaintiff has suffered business losses in an amount greater than $150,000.00. The amount in controversy necessary for diversity jurisdiction over a declaratory judgment action is measured by the value of those business losses. *Id.* § 1332(a).

6. This Court has personal jurisdiction over Defendant because Defendant engaged in substantial business activities in Pennsylvania. At all relevant times, Defendant transacted, solicited, and conducted business in Pennsylvania through its employees, agents, and/or sales representatives and derived substantial revenue from such business in Pennsylvania. Defendant also purposefully availed itself of jurisdiction in Pennsylvania when it sold Plaintiff its insurance coverage for business in Pennsylvania.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because Defendant sold insurance coverage to Plaintiff, which is the subject of this action, in this District.

## PARTIES

8. Plaintiff HSWP owns and operates the Senator John Heinz History Center, as well as other museums and historic sites in the Commonwealth of Pennsylvania (collectively, "Insured Property"). Plaintiff's principal place of business is 1212 Smallman Street, Pittsburgh, Pennsylvania 15222. Plaintiff is a citizen of Pennsylvania.

9. Defendant Federal Insurance is an insurance carrier that provides business interruption insurance to Plaintiff. Defendant is headquartered at 202 North Illinois Street, Indianapolis, Indiana 46204. Defendant is a citizen of Indiana.

10. At all relevant times, Defendant issued a policy to Plaintiff to cover business interruption loss from April 5, 2019 until April 5, 2020 and then April 5, 2020 until April 5, 2021.

The policy number is 3597-82-14 PIT. This policy was intended to cover losses to business interruption. *See* Declaration, attached hereto as Exhibits 1 and 2, respectively (hereinafter "Policy").

11. The Policy is currently in full effect in providing, among other things, personal property, business income and extra expense, contamination coverage and additional coverage.

12. Plaintiff submitted a claim for a date of loss pursuant to its policy seeking coverage under this Policy. Defendant rejected Plaintiff's claim for coverage for business loss and business interruption and other claims, contending, *inter alia*, that Plaintiff did not suffer physical damage to its property directly and stating other reasons why Plaintiff purportedly is not entitled to coverage for the losses and damages.

## FACTUAL BACKGROUND

### I. Insurance Coverage

13. Plaintiff faithfully paid policy premiums to Defendant, specifically to provide, among other things, additional coverages in the event of business interruption or closures by order of Civil Authority and for business loss for property damage.

14. Under the Policy, insurance is extended to apply to the actual loss of business income sustained and the actual, necessary, and reasonable extra expenses incurred when access to the Insured Property is specifically prohibited by order of civil authority as the direct result of a covered cause of loss to property in the immediate area of Plaintiff's Insured Property. This additional coverage is identified as coverage under "Civil Authority."

15. The Policy is an all-risk policy, insofar as it provides that covered causes of loss under the policy means coverage for all covered losses, including but not limited to direct physical loss or direct physical damage, unless the loss is specifically excluded or limited in the Policy.

16. The Policy also covers for damages resulting from business interruption when there is property damage.

17. Based upon information and belief, the Policy provided by Defendant included language that is essentially standardized language adopted from and/or developed by the Insurance Service Office ("ISO"). The ISO, founded in 1971, provides a broad range of services to the property and casualty insurance industry. In addition to form policies, ISO collects and manages databases containing large amounts of statistical, actuarial, underwriting, and claims information, fraud-identification tools, and other technical services. ISO describes itself as follows: "ISO provides advisory services and information to many insurance companies. … ISO develops and publishes policy language that many insurance companies use as the basis for their products." ISO General Questions, Verisk, https://www.verisk.com/insurance/about/faq/ (last visited June 5, 2020); *see also* Insurance Services Office (ISO), Verisk, https://www.verisk.com/insurance/brands/iso/ (last visited June 5, 2020).

18. Plaintiff was not a participant in negotiating or drafting the Policy's content and provisions. Plaintiff possessed no leverage or bargaining power to alter or negotiate the terms of the Policy, and more particularly, Plaintiff had no ability to alter, change, or modify standardized language derived from the ISO format.

19. Plaintiff purchased the aforementioned Policy expecting to be insured against losses, including, but not limited to, business income losses at its business.

20. Plaintiff purchased the Policy with an expectation that they were purchasing a policy that would provide coverage in the event of business interruption and extended expenses, such as that suffered by Plaintiff as a result of the COVID-19 pandemic.

21.     At no time had Defendant, or their agents, notified Plaintiff that the coverage Plaintiff had purchased pursuant to an all-risk policy that included business interruption coverage, had exclusions and provisions that purportedly undermined the very purpose of the coverage of providing benefits in the occurrence of business interruption and incurring extended expenses.

22.     Access to Plaintiff's business was prohibited by Civil Authority Orders, which were the direct result of physical loss of or damage to property at or near the Insured Property. The Policy provides for coverage for such actual loss of business sustained and actual expenses incurred.

23.     The reasonable expectations of Plaintiff were that the business interruption coverage included coverage when a Civil Authority Order forced closure of the business for an issue of public safety in the immediate area surrounding the Insured Property.

24.     The Policy does not exclude the losses suffered by Plaintiff and therefore the Policy does provide coverage for those losses.

25.     Plaintiff suffered direct physical loss or damage within the definitions of the Policy as loss of intended use of property, as in this case, constitutes loss or damage.

26.     Based on information and belief, Defendant has accepted the policy premiums with no intention of providing any coverage for business losses or the Civil Authority extension due to a loss and shutdown and property damage.

**II.     The COVID-19 Pandemic**

27.     The scientific community, and those personally affected by the virus, recognize the coronavirus as a cause of real physical loss and damage. It is clear that contamination of the Insured Property would be a direct physical loss requiring remediation to clean the surfaces of the property.

28.     The virus that causes COVID-19 remains stable and transmittable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard and up to two to three

5

days on plastic and stainless steel. *See* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited April 9, 2020).

29. The CDC has issued a guidance that gatherings of more than 10 people must not occur. People in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19.

30. The global Coronavirus pandemic is exacerbated by the fact that the deadly virus physically infects and stays on surfaces of objects or materials, "fomites," for up to twenty-eight (28) days.

31. China, Italy, France, and Spain have implemented the cleaning and fumigating of public areas prior to allowing them to reopen publicly due to the intrusion of microbials.

32. Courts in France have ruled that business interruption coverage applies where businesses lost revenue as a result of being forced to close their doors due to orders of civil authority in response to the COVID-19 Pandemic. *See* https://www.insurancejournal.com/news/international/2020/05/22/569710.htm (last visited June 11, 2020).

33. The determinations by courts in France, and potentially other countries, that coverage exists is consistent with public policy that in the presence of a worldwide pandemic such as COVID-19, businesses that possess business interruption insurance coverage should recover their losses from the insurance carriers.

### III. Civil Authority

34. On March 6, 2020, Pennsylvania Governor Tom Wolf issued a Proclamation of Disaster Emergency, the first formal recognition of an emergency situation in the Commonwealth of Pennsylvania as a result of COVID-19.

35. On March 19, 2020, Governor Wolf issued an Order requiring all non-life-sustaining businesses in the Commonwealth to cease operations and close all physical locations. Businesses that were permitted to remain open were required to follow "social distancing practices and other mitigation measures defined by the Centers for Disease Control." https://www.scribd.com/document/452416027/20200319-TWW-COVID-19-Business-Closure-Order (last visited April 19, 2019).

36. On April 1, 2020, Governor Wolf issued a Stay at Home Order to the entire Commonwealth of Pennsylvania.

37. On, May 15, 2020, Governor Wolf allowed non-essential businesses to open in Allegheny County, however these businesses are limited to take out service.

38. The Pennsylvania Supreme Court recently clarified the Governor's Orders and supported Plaintiff's position that physical loss and damage exists resulting in coverage here. *See Friends of DeVito, et. al v. Wolf*, No. 68 MM 2020 (Pa. Apr. 13, 2020).

39. Further, on April 10, 2020, President Trump seemed to support insurance coverage for business loss like that suffered by the Plaintiff.

> REPORTER: Mr. President may I ask you about credit and debt as well. Many American individuals, families, have had to tap their credit cards during this period of time. And businesses have had to draw down their credit lines. Are you concerned Mr. President that that may hobble the U.S. economy, all of that debt number one? And number two, would you suggest to credit card companies to reduce their fees during this time?
>
> PRESIDENT TRUMP: Well it's something that we've already suggested, we're talking to them. ***Business interruption insurance***, I'd like to see these insurance companies—you know you have people that have paid. When I was in private I had business interruption. When my business was interrupted through a hurricane or whatever it may be, I'd have business where I had it, I didn't always have it, sometimes I had it, sometimes, I had a lot of different companies. *But if I had it I'd expect to be paid*. You have people. I speak mostly to the restaurateurs, where they have a restaurant,

7

> they've been paying for 25, 30, 35 years, business interruption. They've never needed it. All of a sudden they need it. And I'm very good at reading language. I did very well in these subjects, OK. And I don't see the word pandemic mentioned. Now in some cases it is, it's an exclusion. But in a lot of cases I don't see it. I don't see it referenced. And they don't want to pay up. I would like to see the insurance companies pay if they need to pay, if it's fair. And they know what's fair, and I know what's fair, I can tell you very quickly. But business interruption insurance, that's getting a lot money to a lot of people. And they've been paying for years, sometimes they just started paying, but you have people that have never asked for business interruption insurance, and they've been paying a lot of money for a lot of years for the privilege of having it, and then when they finally need it, the insurance company says 'we're not going to give it.' We can't let that happen.

*See* https://youtu.be/_cMeG5C9TjU (last visited on April 17, 2020) (emphasis added).

40. The President is articulating a few core points:

   a. Business interruption is a common type of insurance.

   b. Businesses pay in premiums for this coverage and should reasonably expect they will receive the benefit of the coverage.

   c. This pandemic should be covered unless there is a specific exclusion for pandemics.

   d. If insurers deny coverage, they would be acting in bad faith.

41. These Orders and proclamations, as they relate to the closure of all "non-life-sustaining businesses," evidence an awareness on the part of both state and local governments that COVID-19 causes damage to property. This is particularly true in places where business is conducted, such as Plaintiff's, as the requisite contact and interaction causes a heightened risk of the property becoming contaminated.

42. The Civil Authority Orders entered by the state and local government were in the exercise of authority to protect the public and minimize the risk of spread of disease.

43. The Civil Authority Orders were entered because of the contamination and damage of property caused by the Coronavirus near Plaintiff's Insured Properties.

8

44. These Orders have the effect of prohibiting access to Plaintiff's Insured Properties due to contamination and physical damage caused by the Coronavirus to surrounding property.

45. Even with the entry of these Civil Authority Orders, there remained physical impact not only in and within Plaintiff's Insured Properties but in and around the surrounding property due to the presence of Coronavirus not being detectable other than through microscopic means and occurrence of illness.

**IV. Impact on Plaintiff**

46. Plaintiff's business loss occurred on March 13, 2020, when the coronavirus pandemic made it unsafe to continue operating businesses across the Commonwealth, and when the Commonwealth of Pennsylvania issued its order on March 19, 2020 closing non-essential businesses.

47. Plaintiff continued to incur operating costs while the business was shutdown, including electricity and security, which are required to protect and maintain artifacts in the museum. Plaintiff was in possession of art pieces that Plaintiff was required to maintain and protect at all times.

48. Plaintiff also was forced to cancel weddings and other special events due to the Civil Authority Orders.

49. In April, Plaintiff furloughed 25% of its full-time employees (42 employees) and 100% of its part-time employees (approximately 50-60 employees) due to the business loss.

50. Plaintiff's business reopened on July 1, 2020. Plaintiff must follow strict protocols in operating its business, including wearing personal protective equipment ("PPE") and strict sanitation measures.

51. The Insured Property is not a closed environment, and because people – staff, customers, community members, and others – constantly cycle in and out of the property, there is

an ever-present risk that the Insured Property is contaminated and would continue to be contaminated.

52. It is upon information and belief that Plaintiff's property was impacted and is still impacted by COVID-19.

53. Due to the pandemic, Plaintiff has suffered "direct physical loss of or damage" to their property—under the plain and ordinary meaning of that term. The Insured Property has suffered direct physical loss or damage because COVID-19 impaired the property.

54. This loss is "direct." Plaintiff's loss of business income was occasioned directly by being unable to use its property.

55. This loss is physical. Plaintiff is unable to use its property in the manner in which it had previously used it.

56. This loss is a loss. It is the loss of functionality of the space for business purposes. It is the diminishment of the physical space in the buildings.

57. This is not a non-physical or remote loss such as one occasioned by a breach of contract, loss of a market, or the imposition of a governmental penalty.

58. Plaintiff is required to continue to mitigate the damages caused to its property by the virus. Plaintiff is required sanitize and take additional measure to clean the property to insure it does not cause additional property damage.

59. Plaintiff's Insured Property is more susceptible to being or becoming contaminated, as both respiratory droplets and fomites are more likely to be retained on the Insured Property and remain viable for far longer as compared to a facility with open-air ventilation.

60. Plaintiff's Insured Property is also highly susceptible to rapid person-to-property transmission of the virus, and vice-versa, because the nature of the business places staff and

customers in close proximity to the property and to one another and because the nature of the activity exposes people to high levels of respiratory droplets and fomites being released into the air of the property.

61. The ISO affirms that a virus can cause physical damage and business interruption merely by its presence and the need to replace potentially contaminated products or disinfect potentially contaminated surfaces, evidenced by the ISO's 2006 circular for an Exclusion Regarding Loss Due to Virus or Bacteria:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses.

62. Indeed, many governmental bodies specifically found that COVID-19 causes property damage when issuing stay at home orders. *See* N.Y.C. Emergency Exec. Order No. 100, at 2 (Mar. 16, 2020)[1] (emphasizing the virulence of COVID-19 and that it "physically is causing property loss and damage"); Broward Cty. Fla. Administrator's Emergency Order No. 20-01, at 2 (Mar. 22, 2020)[2] (noting that COVID-19 "constitutes a clear and present threat to the lives, health, welfare, and safety of the people of Broward County"); Harris Cty. Tex. Office of Homeland Security & Emergency Mgmt., Order of Cty. J. Lina Hidalgo, at 2 (Mar. 24, 2020)[3] (emphasizing that the COVID-19 virus can cause "property loss or damage" due to its contagious nature and transmission through "person-to-person contact, especially in group settings"); Napa Cty. Cal.

---

[1] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf (last visited August 31, 2020).
[2] https://www.broward.org/CoronaVirus/Documents/BerthaHenryExecutiveOrder20-01.pdf (last visited August 31, 2020).
[3] https://www.taa.org/wp-content/uploads/2020/03/03-24-20-Stay-Home-Work-Safe-Order_Harris-County.pdf (last visited August 31, 2020).

11

Health & Human Service Agency, Order of the Napa Cty. Health Officer (Mar. 18, 2020)[4] (issuing restrictions based on evidence of the spread of COVID-19 within the Bay Area and Napa County "and the physical damage to property caused by the virus"); City of Key West Fla. State of Local Emergency Directive 2020-03, at 2 (Mar. 21, 2020)[5] (COVID-19 is "causing property damage due to its proclivity to attach to surfaces for prolonged periods of time"); City of Oakland Park Fla. Local Public Emergency Action Directive, at 2 (Mar. 19, 2020)[6] (COVID-19 is "physically causing property damage"); Panama City Fla. Resolution No. 20200318.1 (Mar. 18, 2020)[7] (stating that the resolution is necessary because of COVID-19's propensity to spread person to person and because the "virus physically is causing property damage"); Exec. Order of the Hillsborough Cty. Fla. Emergency Policy Group, at 2 (Mar. 27, 2020)[8] (in addition to COVID-19's creation of a "dangerous physical condition," it also creates "property or business income loss and damage in certain circumstances"); Colorado Dep't of Pub. Health & Env't, Updated Public Health Order No. 20-24, at 1 (Mar. 26, 2020)[9] (emphasizing the danger of "property loss, contamination, and damage" due to COVID-19's "propensity to attach to surfaces for prolonged periods of time"); Sixth Supp. to San Francisco Mayoral Proclamation Declaring the Existence of a Local Emergency, 26 (Mar. 27, 2020)[10] ("This order and the previous orders issued during this emergency have all been issued … also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time"); and City of

---

[4] https://www.countyofnapa.org/DocumentCenter/View/16687/3-18-2020-Shelter-at-Home-Order (last visited August 31, 2020).
[5] https://www.cityofkeywest-fl.gov/egov/documents/1584822002_20507.pdf (last visited August 31, 2020).
[6] https://oaklandparkfl.gov/DocumentCenter/View/8408/Local-Public-Emergency-Action-Directive-19-March-2020-PDF (last visited August 31, 2020).
[7] https://www.pcgov.org/AgendaCenter/ViewFile/Item/5711?fileID=16604 (last visited August 31, 2020).
[8] https://www.hillsboroughcounty.org/library/hillsborough/media-center/documents/administrator/epg/saferathomeorder.pdf (last visited August 31, 2020).
[9] https://www.pueblo.us/DocumentCenter/View/26395/Updated-Public-Health-Order---032620 (last visited August 31, 2020).
[10] https://sfgov.org/sunshine/sites/default/files/sotf_061020_item3.pdf (last visited August 31, 2020).

Durham NC, Second Amendment to Declaration of State of Emergency, at 8 (effective Mar. 26, 2020)[11] (prohibiting entities that provide food services from allowing food to be eaten at the site where it is provided "due to the virus's propensity to physically impact surfaces and personal property").

63. The Coronavirus is physically impacting Plaintiff. Any effort by Defendant to deny the reality that the virus causes physical loss and damage would constitute a false and potentially fraudulent misrepresentation that could endanger Plaintiff and the public.

64. Contamination and damage to Plaintiff's Insured Property and surrounding property caused by the Coronavirus constitute "direct physical loss" and are Covered Causes of Loss within the meaning of the Policy.

65. A declaratory judgment determining that the coverage provided under the Policy exists and is necessary so as to prevent Plaintiff from being left without vital coverage acquired to ensure the survival of the business due to the shutdown caused by the civil authorities' response. As a result of these Orders, Plaintiff has incurred, and continues to incur, among other things, a substantial loss of business income and additional expenses covered under the Policy.

## CAUSE OF ACTION

## DECLARATORY RELIEF

66. Plaintiff realleges and incorporates by reference into this cause of action each and every allegation set forth in each and every paragraph of this Complaint.

67. The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the

---

[11] https://durhamnc.gov/DocumentCenter/View/30043/City-of-Durham-Mayor-Emergency-Dec-Second-Amdmt-3-25-20_FINAL (last visited August 31, 2020).

13

rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

68. An actual controversy has arisen between Plaintiff and Defendant as to the rights, duties, responsibilities, and obligations of the parties under the Policy in that Plaintiff contends and, on information and belief, Defendant disputes and denies that:

   a. The Orders constitute a prohibition of access to Plaintiff's Insured Property;

   b. The prohibition of access by the Orders has specifically prohibited access as defined in the Policy;

   c. The Orders trigger coverage;

   d. The Policy provides coverage to Plaintiff for any current and future civil authority closures of businesses due to physical loss/or damage directly or indirectly from the Coronavirus under the Civil Authority coverage parameters;

   e. The Policy provides business income coverage in the event that the Coronavirus has directly or indirectly caused a loss or damage at the insured premises or immediate area of the Insured Property; and,

   f. Resolution of the duties, responsibilities, and obligations of the parties is necessary as no adequate remedy at law exists and a declaration of the Court is needed to resolve the dispute and controversy.

69. Plaintiff seeks a Declaratory Judgement to determine whether the Orders constitute a prohibition of access to Plaintiff's Insured Property as Civil Authority as defined in the Policy.

70. Plaintiff further seeks a Declaratory Judgement to affirm that the Order triggers coverage.

71. Plaintiff further seeks a Declaratory Judgment to affirm that the Policy provides coverage to Plaintiff for any current and future Civil Authority closures of businesses in the Commonwealth of Pennsylvania due to physical loss or damage from the Coronavirus and the policy provides business income coverage in the event that Coronavirus has caused a loss or damage at the Insured Property.

14

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff herein prays as follows:

a. For a declaration that the Orders constitute a prohibition of access to Plaintiff's Insured Property.

b. For a declaration that the prohibition of access by the Orders is specifically prohibited access as defined in the Policy.

c. For a declaration that the Orders trigger coverage under the Policy.

d. For a declaration that the Policy provides coverage to Plaintiff for any current, future and continued civil authority closures of businesses due to physical loss or damage directly or indirectly from the Coronavirus under the Civil Authority coverage parameters.

e. For a declaration that the Policy provides business income coverage in the event that Coronavirus has directly or indirectly caused a loss or damage at the Plaintiff's Insured Property or the immediate area of the Plaintiff's Insured Property.

f. For a declaration that under the circumstances of the COVID-19 pandemic and the entry of the Civil Authority Orders, Plaintiff had no choice but to comply with the Orders and Plaintiff's compliance resulted in business losses, business interruption, and extended expenses, and therefore constitutes covered losses.

g. For such other relief as the Court may deem proper.

**TRIAL BY JURY IS DEMANDED**

Plaintiff hereby demands trial by jury.

Dated: August 31, 2020

Respectfully submitted,

*/s/ D. Aaron Rihn*
D. Aaron Rihn, Esquire
PA ID No.: 85752
ROBERT PEIRCE & ASSOCIATES, P.C.
707 Grant Street, Suite 125
Pittsburgh, PA 15219
Telephone: (412) 281-7229
Facsimile: (412) 281-4229
Email: arihn@peircelaw.com

Arnold Levin, Esquire
Laurence Berman, Esquire
Frederick Longer, Esquire

15

Daniel Levin, Esquire
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3697
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
Email: alevin@lfsblaw.com
flonger@lfsblaw.com
dlevin@lfsblaw.com

Richard M. Golomb, Esquire
Kenneth J. Grunfeld, Esquire
GOLOMB & HONIK, P.C.
1835 Market Street, Suite 2900
Philadelphia, PA 19103
Telephone: (215) 985-9177
Facsimile: (215) 985-4169
Email: rgolomb@golombhonik.com
kgrunfeld@golombhonik.com

W. Daniel "Dee" Miles, III, Esquire
Rachel N. Boyd, Esquire
Paul W. Evans, Esquire
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
Montgomery, AL 36103
Telephone: (334) 269-2343
Facsimile: (334) 954-7555

*Counsel for Plaintiff*